Good morning, Your Honor. May it please the Court, my name is Russell Petty, representing the plaintiff and appellant Carilei Oldoerp. And obviously the Court is concerned about the standard of review issue, and so I guess I'll start there. As the Court is obviously aware, there are two places in the record that could purport to be grants of discretionary authority to MetLife. One is in the summary plan description, and one is in the document, which is entitled Additional Information, which the district court found was physically attached to the certificate of insurance. Well, it's inside some booklet called Your Benefit Plan or something like that, right? It's physically attached, Your Honor, but the district court did not find that it was part of the plan. And I think that would be – But isn't that whole book called Your Benefit Plan, and then does it – am I wrong about that? Your Honor, there is – there is a document called Your Benefit Plan, and the additional information is physically attached to that, but physically attaching something to it doesn't have a cover. I'm confused about something. That document that you call – you decided to – it says Your Benefit Plan. At the bottom of it, it says Exhibit 5. What does that mean? And I'm not – Exhibit 5 to what? Do you know what I'm talking about? I do not, Your Honor. On the excerpts of record, page 84, Your Benefit Plan, Wells Fargo & Company, February 1, 2007, at the bottom says Exhibit No. 5. What's – So, Your Honor, I – it might have been labeled that way at the district court for some reason or other. I'm – Well, what I'm wondering is, is this – is the plan an exhibit to some other larger – because this appears to be the Certificate of – or three – two pages later starts the Certificate of Insurance, right? That's correct, Your Honor. So it appears that this is all part of something else, and that's – I'm trying to figure out what. Your Honor, I'm – and I apologize. I'm simply uncertain as to whether it was labeled this way for litigation, and we simply just put it in the excerpts in the manner in which it was filed by MetLife at the district court or – Well, the Certificate of Insurance says this certificate is issued to you under the group policy, but there's nothing that's labeled – there's nothing here that's called the group policy. There's just this Your Benefit Plan. Well, you know, and it's confusing, Your Honor, because – and then it goes on to say – and it includes the terms and provisions of the group policy. So from that language, you would – you would think, assuming that it means what it appears to say, that the group policy is included within the certificate. And, of course, that's opposite of what the district court found. The district court found that the group policy included the certificate, whereas the certificate said the group policy is contained within it. So I think there's some confusion there, and frankly – Well, it doesn't seem like – it says this certificate is part of a group policy. That doesn't seem very confusing. Well, it says it's issued to you under the group policy, and it includes the terms and provisions of the policy. So in other words, the terms and provisions of the policy are included within the certificate, Your Honor. That's what it appears to be saying. Well, where are you reading from now? Pardon me, Your Honor? Where in the excerpts are you reading? Oh, I'm sorry, Your Honor. That's page 87, the face page of the certificate. And I think, frankly, the confusion as to exactly what the additional information is and what it was a part of is the reason why – and there's no getting around this fact that in its conclusions of law, the district court relied exclusively on the language in the summary plan description in order to find discretion. If you look over at the conclusions of 4, 5, and 6 in the findings of fact and conclusions, those are the only parts of the conclusion that address whether de novo or discretionary view should apply. Can I ask a question? Yes, Your Honor. Why does this matter in this case? It doesn't matter in this case. I mean, I'm wondering whether – when we had a conversation before about how this would – could matter, but if we thought – suppose we were to look here and we said, look, whether we apply abuse of discretion or de novo review would come out the same place, that it doesn't matter, right? Well, you know, Your Honor, I mean – I mean, I think that I should prevail under either standard. Ms. Oldorf should prevail under either standard. And so the – you know, I'm – to some extent, the – you know, I came here with four issues I was going to talk about, and the standard review was not one of them. The Court is concerned about the standard review, and so I'm addressing it. I really think a more significant issue is the – well, two issues, really. Number one, that MetLife improperly demanded objective proof of subjective symptoms. And number two, that it did no meaningful evaluation of Ms. Oldorf's psychiatric symptoms. Now, those – those are related because the only physician who actually looked at the psychiatric symptoms and whether they were disabled was Dr. Goldman, and Dr. Goldman's report was clear that he rejected those psychiatric symptoms purely on the basis that they weren't corroborated by objective information. I'm not misreading the – Dr. Goldman's report because the district court found the same thing at paragraph 21 of his findings, which the district court recognized that that was the sole basis for Dr. Goldman's rejecting the psychiatric symptoms. And MetLife doesn't dispute in their briefs that they demanded objective proof of Ms. Oldorf's subjective symptoms. Instead, what MetLife does is it cites to – well, the same three cases that it cited to in the Nolan v. Held College case. And in Nolan v. Held College, the – this court held if those three cases didn't apply, they were out of circuit in the law in this circuit, is that you can't demand objective proof of subjective symptoms. What does objective proof mean? I mean, I understand you can't prove by a medical examination whether somebody is depressed, but you could have objective proof about how she's behaving or how she – you know, what she's doing in her daily life, which would be relevant to whether she's depressed. Well, I mean, there are certainly things that MetLife could have done if it questioned whether Ms. Oldorf's statements and the statements of her treating practitioners that she was severely depressed and nonfunctional, there are things they could have done. They could have sent somebody out to visit Ms. Oldorf. They could have sent her to a medical examination. They could have had her surveilled to see if she, you know, acts the way when she thinks no one's watching as – but the fact is they did none of that. Instead, they just said, not objectively proven, game over. And I submit, Your Honor, that the law of this circuit no longer allows claimed fiduciaries to act in that – in that fashion. As I said earlier, this is directly related to the issue of whether MetLife ever – and again, this is sort of the Court's point about the statute of standard review falling out. It really doesn't matter because the district court had no evidence whatsoever that the statements of Ms. Oldorf's treating practitioners, Dr. Simolak and Dr. Ornacki, that she was depressed from these psychiatric symptoms, there's no evidence whatsoever in the record rebutting that because all Dr. Goldman relied on was the lack of objective data. And of course, there can't be objective data as to whether somebody is depressed. And on appeal, no one at all even looked at the issue of these psychiatric symptoms. Dr. Murphy was a psychologist and that was supposed to be his job on appeal. But what he did was he made a determination. He recognized these symptoms exist, talked to Dr. Simolak who, you know, told him just how severely disabled Ms. Oldorf was from these symptoms. But instead he said, I think these symptoms are secondary to the – Ms. Oldorf's physical conditions, so I'm going to defer to the rheumatologist. The rheumatologist was Dr. Schmidt and she not only did not evaluate the psychiatric symptoms, but she stated expressly in her report that she wasn't confident to do so. And of course, Dr. Bono, all he looked at was the – whether there was an infectious disease and finding none said, you know, my work is done. So in point of fact, there is not a shred of evidence. There was not a shred of evidence before the district court that Ms. Oldorf was not in fact disabled from her psychiatric symptoms as was claimed by both of her treating physicians with respect to that issue, treating practitioners. One of them wasn't a physician. So just so I understand your position clearly, you would suggest to us that it doesn't matter if we apply the abuse of discretion standard because you think it's just so overwhelming that we could find that, as Lucas argued in the case just prior to this, that the record is just so clear that we should jump right to the end and grant the benefits requested. I think demanding objective proof is a clear error of this Court's prior holdings and there's no evidence whatsoever rebutting the statements of Ms. Oldorf's treating practitioners that she was disabled from her psychiatric symptoms. So from those two points, the standard issue does not matter. Okay. You're about out of time. We'll give you a minute in rebuttal. Thank you. Thank you, Your Honors. Good morning, Your Honor. Michelle McAloon Constance on behalf of Aptly Met Life and I'm joined by Counsel Rebecca Hull who's joining on behalf of the Wells Fargo LTD plan. I would like to get to the issue of the significant evidence that the, in the administrative record that supports Met Life's determination that benefits are no longer supported after February of 2008, but I understand that Your Honors are concerned about the abuse of discretion issue and the plan document issues. Yes. With regard to that, do you agree to begin with that if this is only in the STP, it doesn't count? Your Honor, in some cases, the summary plan description is the only plan document and so in many cases, if the summary plan description serves as both the summary plan description and the plan document itself, then discretion could, could exist only. But it's not true here. I'm sorry? But that's not true here. It's not true here because we have a little bit. So everything turns on whether this piece of paper that is called additional information is part of the plan. I don't even know how to pose that question, but that seems to be the question. Your Honor, there are two plan documents in the administrative record in this case. There's the summary plan description and there's the Your Employee Benefit Plan document. Both of those documents contain discretionary authority. Unlike the Amara case, which counsel has cited. Both contain? Yes, Your Honor. You say both? Yes, Your Honor. Where is it in the certificate? Your Honor, the document that is in the administrative record is the Your Employee Benefit Plan document. The certificate is incorporated into that document, but the certificate is not the plan document I'm referring to. The two documents in the administrative record are the summary plan description and then the Your Employee Benefit Plan document, which incorporates the certificate as part of the document, but it begins. The certificate, the certificate or the document says, let's see, excerpts of record 135, that the entire contract involved here is the group policy and the certificate, the policyholder's application. That's not relevant here. Any amendments or endorsements to the group policy. That's what it says. That's the contract. That's the insurance contract, as I understand it, between Wells Fargo and the company. So that's the contract. Your Honor, you're correct. The contract. And specifically, the other document you're referring to is specifically not part of the certificate. It says so. Your Honor, Admin 34 through Admin 97 is a document, a plan document entitled Your Employee Benefit Plan. That entire document from Admin 34 to Admin 97 is a plan document. Well, but a lot of what's in there after the additional information part is just material from ERISA. It's information. It doesn't read like a plan. It doesn't, it's, some of it is simply reciting what's in ERISA. It doesn't even purport to be the plan. You know, you're saying, well, it says Your Benefit Plan is a plan document. Fine.  You can call them anything you want. The point is, it's not a question what's a plan document. The question is, what's the plan? And the plan, at least according to this thing, I guess is if I set up a trust, my plan is my trust. And the plan here, according to this, is what it says it is. It looks to me. It's the group policy. Your Honor, I'd like to address that. The certificate. That's what it says. Your Honor, I'd like to address that. Sure. Because the plan documents are the documents that support what plan benefits are offered by the plan sponsored to its employees. The certificate of insurance and the policy documents, those are a contract between the insurer and the employer that fund. They are a funding mechanism for the plan that the employer has set up. It doesn't have to, the employer doesn't have to get an insurance policy to cover its plan. It can self-fund. But in this case, it does have an insurance policy that funds the benefit plan. But the benefit plan terms itself are communicated to the employees via the summary plan description. The contract of insurance that funds the plan is not the plan. Wouldn't the right thing to do here be to send this back to the district court to make specific findings on these issues that we're talking about here, so we can have a specific finding from the court as to what is the plan and is the certificate the plan or is the certificate part of the plan and if, you know, whatever the outcome of that may be. Because here, all we really know is that the district court relied on the summary plan description and we know that Amara says you can't rely solely on the summary plan description if it is inconsistent with the plan itself. And since we don't have a finding as to what exactly the plan is, how can we make that determination? Your Honor, the only two plan documents in front of this Court both contain discretion. In the Amara case, there was a plan document and a summary plan description and the summary plan description contained additional terms. But there is absolutely no reason to believe in this case that the summary plan description does not accurately summarize the plan terms. There is no reason to believe that it adds terms that are not in the plan. That only works if the additional information sheet is part of the plan. That argument only works if that's the case. If it's just the certificate of insurance, then what you have is potentially a conflict between a plan that is silent and a summary plan description that reserves discretion. And that falls under Amara, doesn't it? Well, Your Honor, first of all, ERISA, the statute, obligates the plan sponsor and the plan administrator to have to certain duties in communicating the terms of the plan. The certificate of insurance is a separate document. It is not the plan document. The certificate of insurance is a contract to fund the plan. There's the ERISA statute provides for what the plan documents are. And certificates of insurance are not the plan document. Those are contracts between the employer and the insurance company that may be entered into to fund the plan. They are not the plan. So I don't think sending it back to the district court, which I believe was Your Honor's question, is going to be necessary here, because calling the certificate the plan is inconsistent with ERISA. The certificate is simply a part of the policy, which is the contract with the employer and the carrier to fund the plan that the employer has set up. It would be helpful to me if you would do a little discussion on the merits. Absolutely, Your Honor. Your Honor, one of the issues that the appellant has raised is that there isn't substantial evidence to support Metlife's decision here. And in particular, appellant challenges the purported requirement to submit objective evidence as if that is the basis for Metlife's determination here. In fact, there is substantial evidence in the record that supports Metlife's decision from the claimant's treating nurse practitioner, clinical observations that support Metlife's determination here. In August of 2007, the claimant went out of work. There was an initial lack of information that, you know, in the initial September 2007 timeframe, but as of October, December 2007, her treating nurse practitioner submitted evidence supporting that she had a class four limitation based on severe fatigue and opining that she couldn't work any hours in a day. But as of February, well, I'm sorry, as of March 2008, those opinions in the clinical observations did not support further benefits. So, for example, in March 2008, Nurse Rosedale, the treating nurse practitioner for internal medicine, opined that the claimant had improved. While she had previously indicated that there was a class four restriction, now she was opining it had dropped down to a class two restriction, where class one is no limitation at all. She reported that she had advised her patient to return to work immediately, and while she indicated that she believed initially the claimant should return to work five hours a day, about 20 hours a week, when she spoke with Dr. Del Valle, the independent physician consultant internist, she indicated that she didn't have any basis for supporting why she couldn't work full time and was unable to identify activities that the claimant was unable to participate in due to her fatigue. In light of this information, MetLife reasonably determined that there was no longer support for benefits, but MetLife had approved benefits for August, September, October, November, December of 2007, January of 2008, based on the claimant's self-reported symptoms and the clinical observations of her treaters. And it was only when those clinical observations changed and there was not further support for the severity of symptoms she was claiming that MetLife determined that benefits were no longer payable. In addition, Dr. Frey, who submitted a letter in April 2008 to MetLife, indicated that she had improved on her medications. Now, while he did say that he expected she would improve and then relapse and then he saw her was in February of 2008, and so he was unable to opine whether or not she was able to work after that time. So the decision of MetLife to approve benefits for August 2007 through February 2008 was based on her self-reports and the clinical observations of her treaters and the determination as of March 2008, again, was also based on the clinical observations of her treaters. Your Honor, it looks like my time is up. Your time is up. So thank you very much. Thank you. Very, very briefly, Your Honor. First off, with respect to the substantive issues, to suggest that Ms. Oldorf's treating physicians no longer believe she was disabled in March is cherry-picking of the worst sort. The one, there's one report in March by Dr. Rosdahl who was not even treating Ms. Oldorf for her psychiatric condition that suggested a capability for part-time work. That was in March. In May, Dr. Murphy spoke to Dr. Simolak, who was treating Ms. Oldorf for her psychiatric symptoms, and she, again, related the severity of those symptoms and the lack of functionality of Ms. Oldorf. And so to ‑‑ it's just taking that one report out of context. In our briefs, Your Honor, we stated there was no place in the record where the psychiatric conditions were looked at. There was no citation given during argument by counsel for whether there was any serious, meaningful consideration to those psychiatric symptoms. And so I submit that that's just undisputed at this point. Real quick, and I see I've got the stoplight, but on the record ‑‑ Kagan. Go ahead. Finish your sentence. Your Honors, I mean, it's a fascinating question. We have a lot of issues with respect to what does the plan say, but you see very little law, and it comes up often at the district court level of, well, what exactly is the plan? I submit that the plan ‑‑ you know, an insurance company cannot write something down and attach it and call it a plan document and hand it out and say, well, we've given ourselves discretion. Discretion has to come from the plan sponsor. Well, one ‑‑ I mean, it's all a peculiar standard anyway, because it is self‑defined. And what's the difference if they write ‑‑ there's a thing called ‑‑ it says your benefit plan, and there's a certificate of insurance, and then there's some other stuff. And it's all ‑‑ is this a booklet or is it ‑‑ there's one thing I couldn't tell. Is this a booklet that's bound or is it pieces of paper stuck together or what is it? Well, you know, the problem is, of course, we don't know. But my point is, Your Honor, is that discretion has to come from the plan sponsor. There has to be the plan sponsor has to say to the insurance company that's going to be providing benefits to the ‑‑ All right. Well, who puts out this little booklet called your benefit plan? Well, you know, I presume it's a document put together by MetLife, and it includes some documents that the plan sponsor signed off on, like certificate, and it may include other documents that MetLife just decides to put in there. And so the question is, and I think if it does go back down to the district court on this point, I don't know that it's necessary for the reasons I stated earlier. That kind of has to be the question. Well, is this ‑‑ The district court ‑‑ I mean, the district court kind of made a finding, except he then didn't rely on it. Well, it ‑‑ He sort of said this was part of the plan. Didn't he say that? Only found that it was physically attached to the other documents, which are part of the plan. I thought he said it was incorporated or something. But the real issue, I think, before the district court is, is this something that the plan sponsor agreed to? Did the plan sponsor say, you know, is it part of a contract with MetLife? MetLife, you have discretionary authority. Because it has to come from the plan sponsor. I don't see how it can possibly come from the insurance company. I don't see how you could possibly grant yourself discretion, Your Honor. That's exactly what the Supreme Court said at Amara, that it has to come from the plan sponsor. It has to be part of the contract. I think that's right, Your Honor. I see my time is long gone. Okay. Thank you very much. Thank you, Your Honor. Thank you to both lawyers for the case of Oldhorp v. Wells, Fargo & Company, which is now submitted.
judges: Smith, Fernandez, Berzon